Thank you. May it please the Court, my name is David Steingold. I'm here on behalf of Antonio Bravata. I'm sorry, Your Honor, I didn't want to be too loud. Again, I represent Antonio Bravata and, in fact, I also represented him at trial, as I'm sure the Court is aware. The government reached a conclusion in this case that's reflected at page 20 of its brief and pretty much sums up their position at trial, when they say that it was impossible for anyone at BBC to think its business was successful. That's a conclusion. There was no evidence to support it, other than the fact that they showed that my client read a script that contained false statements. And I'm not claiming that it didn't contain false statements. It did. You said was successful. Successful. Business. The prosecution maintains that it was impossible for anyone at BBC to think its business was successful. That is. What does that have to do with your next statement? What was your next statement? The next statement is that the only evidence that they presented on the the successfulness, on the fact that anybody would know that my client especially would know that he wasn't successful, that the business wasn't successful, well, there was no evidence presented that my client knew the business was not successful. And that's what the case came down to. And I harped on it from the voir dire on, that it's a case about knowledge. That it's one thing to say that Antonio Bravado read a script that was provided by his boss, a script that was read by all the sales representatives, a script that even Theresa Makowski, the prosecution witness, indicated they considered the Bible identical to what other sales representatives were pitching. But it doesn't show that they knew that the statements were not true. Really? Not knowing that his company was not successful, isn't that belied by this exchange that we know from his, is his name Trubisky, Bravado, and the two that formed it? At some point he said we don't have any money, and the testimony from that gentleman was Mr. Bravado said, then I'll go get some, because they weren't segregating the incoming money, they were paying it back out to other folks. So if you don't know it's successful, I mean, if you don't know you need more money because you haven't made any, that would seem to be a pretty good indication. That's John Bravado. Antonio Bravado was a salesman. He was not in management. The record is clear that my client was never involved in any management meetings. Throughout the trial, the members of the management team testified one by one. That included Mr. Trabolsi. I didn't even have to cross-examine Mr. Trabolsi. He had no knowledge that my client was involved in the conspiracy that he was running with John Bravado. The government's theory there was, well, John Bravado knew that his son was involved, even if Richard Trabolsi didn't know, and Richard Trabolsi didn't know. And it's also an interesting aspect of the case that the indictment names only three people as being in the conspiracy. John Bravado, Antonio Bravado, and Mr. Trabolsi. There was no indication of other unindicted co-conspirators. There was no indication that my client must have learned this, the scheme and the object of the conspiracy, from somebody else because there were only two other members. Father's son. He's the son. And that's right. He's the son. But he was not in management. Now they want to assume that he had knowledge, and if that's true, if my client had to have known because it was impossible for anyone to think the business was successful, then that paints with a pretty broad brush and would include the other sales representatives. Because if my client would have known that the business was on the verge of failure, then all the other salespeople would have known that as well. But the testimony of those other sales representatives was to the contrary. And they would have no way of knowing what the status of the property is. We have no idea. We just know what we were told. And from all appearances, things were going great. He gave those speeches where he used words like guarantee and all of that. Your Honor, they have a partial taping of the first seminar that my client gave where he was provided with the script that was prepared by John Bravada and given to him and given to all of the salespeople and said, read it. This is it. So my client read it, and it was written. It was John Bravada's speech. It was given by John Bravada, who was a manager, and my client blindly read the script. And over time, apparently that script was altered somewhat, but the basis of the government being not true. Was there evidence that he was aware that, was the guy Seller? What's the guy's name? John Sellers. That Sellers said do not guarantee? No, and I'm going to get to that, Your Honor. That's an excellent question because there were different tiers and different layers of management, and there was this clear dichotomy between the management on the one hand and the sales on the other. The levels of management include Mr. Trabolsi and Mr. John Bravada. They were the CEO, the managers, the chairman, and involved other people, names, for instance, Mr. Cercelli. The next level included the CFO, the CEO, the managing partners, the property management director, the property review board. The CFO, Melissa Traver, testified that Antonio Bravada was in the room. The others, you mentioned Mr. Sellers, and that's an excellent point because Mr. Sellers testified, and I think you'll find that at volume two, page 98, he never spoke to my client. My client, even when he sent an email around about not using the word guarantee, my client was not included in that, and there was no one that ever testified that at a meeting they said this is guarantee, and one witness said my client told him go ahead and use it anyway. My father said it was okay. That's what he did. He believed his father was doing the right thing. He drank the Kool-Aid, to borrow a phrase, and believed that when... Excuse me. Isn't that some evidence that he's directing people to use the word guarantee anyway? He had no ability to direct anyone to do anything. All of these say, no, he was not a supervisor. He was a sales rep. He had no supervisory control over any other sales people, and the other sales people, including Zach Davis, Janice Davis, James Deacon, Brad Hagan, they all testified they didn't know anything was going on. In fact, Janice Davis, who was... Were they all paid the kind of sums of money that Antonio was? Well, that's another interesting question, because when we asked Agent Seuss, who testified that my client made, I think it was Miss Aguiar who indicated that my client made about 200 and something thousand over the two and a half years. I asked Agent Seuss if she determined how much the other sales agents made. Was it more, Mr. Bravado? Was it less? She didn't investigate anyone else. I asked her, did you... You're yelling a little bit here. I'm sorry. I don't want to be told to keep my voice. You're fine. You did. You did a good job on that. And not only that, but we not only asked her that, I said, did you try to find out what was in the sales pitches made by the other representatives? If they were the same or identical as Miss Mikowski testified to, and she said no. She was convinced that my client was and no one else. I challenged the government at trial, and I still have not seen it even to this point, of one email, one meeting, one person who can say, I told Antonio Bravado that the property values were gone, that we were on the verge of bankruptcy. I told Anthony Bravado that they were over-leveraged. None of the management left before the end of this. They were in the process of building multi-million dollar new offices in Southfield. My client had his mother and his grandmother invest. They didn't divest. There was never an occasion where a person was not paid their interest in a timely basis. There was not one instance. Did he believe, I'm sorry, he told Terry Welch that the company had distributable profits approaching 50 million? Your Honor, I cannot justify the statements my client attested to in that Welch statement. But the point is, even if they were shown to be false statements, they have to be shown to be in furtherance of the conspiracy. They have to show that he had knowledge of the conspiracy, that in fact this to put them, as he did his mother and grandmother, into a business that he had every reason to believe was flourishing from all appearances. I don't have to talk about Mr. Sellers. He was not even listed as a conspirator. And here's a man who was a silk stocking lawyer, brought into this company, brought in other attorneys with him, who knew precisely what the financial condition of the company was. Who knew precisely what was in that to advise the sales representatives, you cannot do this anymore. He was not a co-conspirator. And I asked him, did you ever speak to my client? He never even spoke to him. Now, I wanted to talk just a moment, because I know I only have two minutes to go. But before I do that, let me just use the Gienapp as a basis to allege my client had some knowledge, because my client was charged for defrauding the Gienapps, and he was found not guilty on those. And Ms. Gienapp herself testified to the integrity and honesty. And Ms. Deborah Davis, who's also a sales representative, whose family and friends lost millions, testified that there was no way that my client would have known anything more than her. That she believed my client absolutely had no knowledge of what was going on. You cannot conceal the worsening financial condition of the company unless you have knowledge of it. And there isn't a scintilla of evidence indicating that my client had knowledge of this. Now, I want to briefly, unless the Court had other questions, to discuss the jury issue. And I'll be brief on this, but this was an interesting juror, former president of the Carpenters Union, even in voir dire, he testified to not being able to estimate how many FBI agents had been through his office. It was a surprise to me they kept him on the jury. And during the questioning of Mr. Welch, when I presented an affidavit that directly contradicted two of the statements he made about not having been told about an EOIR investigation in the SEC, this juror, and this has never happened to me, spoke out from the jury box. He didn't raise a hand or pass a note. He said, Judge, are we going to get a copy of that? Now, that doesn't mean he was on our side, and I know it would be speculative to say that he was favoring my argument, but the bottom line is he was conspicuous by his presence. He had come 80 miles plus one way every day through two winter months. He was never late once. He did not want to leave. This distinguishes the case from a lot of the cases. He did not want to leave. He did not ask to be recused. And the reality is that the judge sent him home without even asking him whether he could come back the next day. That's really the gravity... Your time has expired. It has, Your Honor, and I... I'll tell you, we have finished it in your brief, so you've already given that to us, so don't feel that you've been slighted.  You're welcome. Good morning. May it please the Court, my name is Karen Reynolds, and I am representing the United States. Judge White, I'd like to clarify something based on a question that you asked Mr. Steingold, and you referred to questions about whether Antonio Bravada had been warned about saying the word guaranteed. Mr. Steingold said in his brief that there was only one conversation that ever took place about that. There were numerous conversations, and I hope to have time to go through them in a few moments, but I'd like to refer you to Exhibit 93. That was just filed by the government, I think it was last week, I apologize for the late filing, but that is a letter that was sent from John Sellers to John Bravada, and I think also to R.J. Trabolsi, and he indicated, this is in September... Where's the evidence that Antonio got this? It wasn't that it was the substance of the email, it says that I just received a call from Tony, this is what John Sellers is saying, concerning a prospective investor interested in investing $200,000. He said the person has a number of questions, including information showing that his principle would be guaranteed. I told Tony that I am concerned about anyone expecting or believing that the principle is guaranteed. And that was sent on March 27th of 2008. I just wanted to make sure that that was clarified, because Mr. Steingold seemed to believe that there was no evidence that Mr. Sellers had had that kind of communication with Antonio Bravada. Your Honors, Antonio Bravada was charged because he was more culpable than anyone else that Mr. Steingold would like to compare him to. And he was convicted because there was clear and substantial evidence that he knew about the purpose of the conspiracy, and that he voluntarily and knowingly joined it. And I want to also clarify, Mr. Steingold kept saying that in order for him to understand the purpose of the conspiracy, he had to know the details about the financial circumstances of the company. And that's not true. This conspiracy is charged as a conspiracy to lie to people to get their money, basically. To lie to them, to say anything that it took to make them feel comfortable about really, in almost every case, putting their life savings into BBC equities. And as far as the evidence that the government had, there's quite a bit of it, but I'd like to start with one of the things that you all questioned Mr. Steingold about at the end. And that is the relationship that Antonio Bravada had with Terry Welsh, who was one of the investors that he persuaded to invest in BBC. And I say a relationship because there were numerous contacts between Mr. Welsh and Mr. Bravada. It is an example of Antonio Bravada not only being willing to say the things that were lies in the script, but to go beyond what was in the script to make up his own lies, to embellish what he had already said. To essentially say what he needed to to get people to invest. If the only thing that the jury believed was that he lied to Terry Welsh to get Terry Welsh's money, that's enough for him to have been convicted of the conspiracy. And I'm hoping I'll have a moment to talk about some of the other things. But as far as Terry Welsh goes, he listened to the seminar. This is not a situation where we have to speculate about what Antonio Bravada said during the seminars. We have a videotape of it, and even though Mr. Steingold said it was partial, the evidence of trial showed that there was maybe a couple of moments at the beginning of a lengthy presentation that were taped over with a football game. But he said all the things that were proven at trial to be a lie. The guarantee, the principle being guaranteed, interest being guaranteed, money being safe at a bank, and a CD. But how do we know that he knew that none of this was true? So what we need to do is to show situations where we can prove that he lied to people, and Terry Welsh is a good example of that. So we know on videotape what he told Terry Welsh. We know those things are not true. Then we know that he went to Terry Welsh's house two or three times and met with him to try to persuade him to invest. We know that at that time he told Terry Welsh that investors in BBC were getting 30% interest. That's nowhere. That is not in the script. That is not true, to say the least. But no one else has come up with that. This appears to be something that Antonio Bravada has made up. He said, I don't get paid unless there's profit. I don't get commissions. That was really important to Terry Welsh because he wanted to make sure that Antonio Bravada, who was a young man at that time, wasn't saying whatever he needed to say to get his money. So he questioned him about whether he got commissions. There is no question that at this time he was getting paid. Special Agent Kelly Cease, Luz Aguilar from the SEC who testified, and Melissa Traver, who was the CFO of BBC Equity, said he was getting paid the whole time. He was either getting W-2 income or he was getting commissions. All of this, by the way, with Terry Welsh was taking place in June of 2008. That's after the email in Exhibit 93. So after these conversations, Terry Welsh gets the PPM. And he reads it and he's going, wow, what's in the PPM is pretty inconsistent with what this kid is telling me, what this young man is telling me. So I need to get something in writing to confirm that what he said was true. So Welsh sends him a fax and he asks very sophisticated questions. I think there were seven of them. That is in Exhibit 55, which is actually a three- or four-page exhibit that shows this is what happened. Terry Welsh says, I want to make sure, has a conversation with Tony, says, I'm going to send you this fax. I want to make sure what you told me is true. And so I want you to affirm or attest to me that everything in here is true. Antonio Bravado tries to get away with just signing the bottom of it, sends it back to Welsh. Welsh said, you know, that's not good enough for me. I want to know if every single question I am asking you is true. So finally, Tony Bravado sends back a fax where he answers that all of these are true, these statements are true, and even makes some handwritten notes. These questions are way beyond the scope of any script. They are way beyond any other evidence we have of what people were told. And this is what he said. He said, in 2007, BBC Equities earned net distributive profits of $50 million. It's not in the script. It's not in the PPM. And he makes a handwritten note to Terry Welsh that says, not exactly, but close. Even John Bravado said on cross-examination, that wasn't true. We were never profitable. Melissa Traver, the CFO, John Sellers, General Counsel, Kelly Cease, John Bravado, all testified this wasn't true. The next question, one of the other questions, no revenue calculated in the net distributable profits was derived from loans or the sales of shares. He had discussed this with Terry Welsh. He had made this statement to Terry Welsh orally. Welsh wanted it confirmed in writing. This is found nowhere else, and it wasn't true. Also, the vast majority of the revenue calculated in the net distributable profits derived from sales and rental of real property. This was not true. The testimony at trial was overwhelming. And then the last question, I'll put these two together. The last question was whether BBC in 2007 had purchased $500 million in property. Sellers said, I have no idea where that statement came from. Gavin Pike, who was hired by BBC to try to restructure their debt, had put together a valuation report in August of 2008, two months after Welsh invested, that said that the asset value on the properties was less than the debt by $1.6 million. None of the promises that he made to Terry Welsh in exhibition. I'm sorry. The question that Welsh asked Antonio was whether in 2007 the company had purchased $500 million worth of property. The testimony from Pike and several other people was that the property was worth a negative $1.6 million. I know, but those are not inconsistent. Well, there was also, when you, it would seem to me that when you tell someone we bought $500 million worth of property, that the property would be worth that much. And the asset value was not. Plus, there's no other evidence that that statement was made by anyone to an investor. We don't know where it came from. One thing I'm wondering about, and maybe it's a lack of understanding, I read that they were telling people that the money was supposed, that the principal was going to be in CDs, leading people to think that your principal is secure. Right. Okay, so what did people think they were going to make money on? Well, if you read the script, and I think probably it's in about Exhibit 20, it is a convoluted, remember the targeted audience were people who had retired. Most of them were unsophisticated when it came to finances. And basically what they were saying in the script and what they were saying in one-on-one meetings was, we've got a better deal for you. It's going to sound complicated, but we're going to make you money by protecting and guaranteeing your principal. We're going to take the interest that we make on your money. We're going to take the profits that we're making on all this property we're buying. We're using our rental income and our profits that we're making by flipping properties, and we're going to keep investing that and make money that way. None of the properties were profitable. This is another, but the question that Mr. Steingold is asking you to consider is whether Antonio Bravada knew that he was lying to people or knew that he was lying when he told people certain things. So I think circumstantially, although I think Terry Welsh is an example of a direct evidence that he lied to get Terry Welsh's money, but I think there's lots of other circumstantial evidence that shows that he was willing to say almost anything. And I'd like to just briefly go through that. One, as I said before, when he was telling people in one-on-one meetings and at seminars that he wasn't getting paid, he was getting paid. And it wasn't a couple hundred thousand like Mr. Steingold said. It was close to $500,000, and that's from the testimony of Kelly Cease at page ID number 3743. When he got concerned that he wasn't getting the commissions that he thought he should be getting, he called Katie Witkowski and he said, come on, I'm supposed to get the whole commission on Mr. Turkut's investment, and I only got a partial one, and that is Exhibit 24. So it's pretty clear that he was on top of the money he was getting. They were calling them finder's fees, right? Or commissions, either one. And he was also getting W-2 income. He was being paid. So let's move on to the juror. Okay. I mean, this juror wanted to say. The juror, what we know on the record, and this is an affidavit that we don't know much about how it was obtained, you know, assuming that he was telling the truth about what happened. This is a juror who was sick. I think we all agree on that. Let's assume for a second that Judge Borman was incorrect, and he really didn't have a chronic problem. He had the flu, like he said he had. If you are at the end of this really long trial, like we were, and you have two extra jurors, and you have a juror who's sick and arguably had the flu, that alone is within the court's ministerial or managerial authority. The Gagnon case talks about the judge's managerial authority in particularly complex trials. And this is a judge who had tried valiantly. He was extremely meticulous in the management of this case. And there were a couple of jurors way in the beginning of the case that really had some issues, and he thought, you know, we can't face this long trial and not have enough alternates. But now we're talking about a situation where the last witness is on the stand, and this juror may have wanted to stay. I'm not saying he didn't want to because he tried to come back into the courtroom, and he couldn't do it. Let's assume he had the flu like he said he did. He could have infected the whole jury. We could have had a mess. And this was perfectly within Judge Borman's authority to take it on and to make sure that this juror... Well, and they had no idea how long the deliberations would go on either. They went on for a week. Yeah, he would have gotten sicker and sicker presumably in that time or could have. And frankly, and I know this may be a little bit off the record, we all like this juror. He was affable. And I think it's just as appropriate to say that he asked about that exhibit because it was about the government's strongest evidence against Antonio Bravada. And so he could have picked it out for that reason too. This is all speculation. I'm sorry that he had to be off the jury. I'm sorry he didn't get to finish. Obviously he was too. I'd like to make one other point going back to the other issue, Judge. I'm sorry. But all the presenters that we know of and that were testified at trial invested themselves. In fact, Deb Davis not only invested, I think, maybe close to a million dollars of her own money. She invested a lot, but she got her church and her family and all sorts of people to invest a lot of money. Antonio Bravada didn't invest in this company. He didn't put a dime into it. Exhibit 103 is the list of all the investors in BBC, and he's not on it. It is relative? You know, Mr. Steingold talks about his grandmother and his mother who put in. They didn't put money in. They transferred the ownership of real estate to the company in exchange for shares in BBC. So as far as I can tell, Joe Bravada, the brother, John Bravada, Antonio Bravada, nobody put cash in. And when you're telling people this is an incredible deal and you're making 30% per year, you'd think you'd want to put some of your own money into it. Let me ask you another question about the amount of loss. I'm a little confused about this. Okay. They raised $50 million in total. Well, I think maybe a little bit more than that, but what we were able to show was in the $50 million. Okay, and then how did the judge compute the amount of loss? Boy, I wish I was better prepared. What he did is, what we did and what he accepted was that he took the amount of money that had been invested in BBC and he backed out any payments that were made back to the investors. Okay, and also backed out the property that had been purchased? How did the judge treat the money that had been frozen? Did they get credit for that? I think it was $14,000. Oh, that's it? Yeah, and maybe less than that. I'm sorry I'm not better prepared on that, but the freezing took place in the third week of July of 2009. I believe the only money that was in there was about $14,000. None of the properties that were held, and remember, a lot of this was an assumption of debt. It wasn't the purchase of the property, and so there was nothing. There was just money owed. Money owed. That's good. Can I ask a question that you also may not be able to answer because it's kind of coming out of left field? But do you remember when they were calculating the sentences how many insolvencies there were? I do, and, Your Honor, it's important that the definition of insolvency, I mean under the guidelines, it just basically means somebody whose livelihood was substantially affected, and one of the examples of that would be losing your life savings. I think there were over 600 investors in this case. We had to show that over 100 of them suffered that kind of insolvency. I know that number was much larger, but what we did is we went through the victim statements, and who is saying, I put all my 401K in. I've lost everything. I had to go back to work at 70. Who are those types of people? We came up, I believe the number is 138 people, and it's Exhibit D to the government census. We counted, and we couldn't come up with the number that maybe you did, and that was the confusion. But your proposition this morning is that you just have to have over, that you have to have only over or more. Yes, and that's what the guidelines say. Okay. And that was the testimony of special agent, or the summary chart that was put together by special agent Kelly Cease is Exhibit D to the government sentencing memo. Okay, so you're willing to go by whatever, Exhibit D? Yes, yes, and I believe the court has the underlying documentation for that. That's the stuff in the notebook, is it? It is, and the reason, obviously, that it's all sealed is because it has victim identifying. Okay, thank you. If there are no other questions, Your Honors, thank you very much. May you never draw a case like this again. You know, it was, I have to say, it was one of the best professional experiences I had all the way around, although a nightmare at times. I'll take that somewhat as a compliment. Your Honor, very briefly, because I know I have very little time, Exhibit 93, the letter from Mr. Sellers, does not indicate that he ever told Antonio Bravada, don't use that, you can't use it, it's improper. There's no indication that my client was ever told that by Mr. Sellers. My client made statements to Mr. Welts that were shown not to be true, but he did it to have them invest in a thriving company, one that he believed was successful, one that his grandmother did dedicate property valued at $100,000 for. She lost it all. He didn't, though. He didn't have any money. He was 19 years old when this case started, and the amount of money that I attested to Once he started making money here, he didn't roll it back into the wonderful deal, did he? Your Honor, he only made $200,000-something in two and a half years. The number that was given to you by the government from Agencies, that included funds that he had received legitimately from insurance proceeds. They weren't contesting those were improper or that they came from BBC. The number that I used came from their witness. Something personal? I don't know. What was it? What's the insurance proceeds? He made commissions on it. Selling insurance. He was selling insurance. The number that I used came from Luz Aguiar, the SEC accountant, who testified that that's what my client made. So that's the number I used. Well, but he had half a million dollars to dispose of in disposable, presumably disposable income or at least some part of it, and he didn't invest in the company. Your Honor, I do not believe that that number is accurate. It's true that he did not have any money because the money that he did make, quite frankly, he bought a real pretty car and some nice clothes because he was told to play the part. He had a new vet. I think that was in the record. But he did invest his grandmother. He did invest his mother. And he did invest his best friend and his mother to tunes of a million dollars. And they testified they don't believe that he knew what was going on because they would not leave him. Did he take commissions on those? I don't know if he took commission on those. I don't believe he did, actually. I think Ms. Davis got it. But I want to leave you with just one quote about the juror issue because I think this is a 43 violation. I do not believe this is akin to the other cases where jurors asked to get off. It's purely speculative whether or not he would have infected anyone or would have come back the very next day. But it's within the judge's discretion. Well, it's within the judge's discretion if they asked to get off. And the point is there was no record made. And this is the quote I wanted to leave you with, and it's from U.S. v. Gay. Oh, you wanted to leave a quote? Okay. Please. Even though the appellant had not been able to demonstrate prejudice in the present case, the total absence of a record of the proceedings in which the charges and the makeup of the jury occurred requires us to assume prejudice. We have the utmost confidence in the integrity of the district judge who presided in these proceedings and of the trial judge of the circuit individually and as a group. However, in a time when our judicial system is being severely questioned, it is important to maintain the appearance of justice and regularity as it is to be certain of their reality. All right. Thank you. Thank you, Counselor. Thank you, Your Honor. I see you're serving under the Criminal Justice Act. I am. And we thank you for that service. And thank you very much for giving me the extra time.